**In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.**

**Bankruptcy No. 88–00043.**

United States Bankruptcy Court, D. New Hampshire.

Nov. 10, 1988.

Don Willenburg, Los Angeles, Cal., Richard Levin, R. Carl Anderson, Concord, N.H., for Public Service Co.

Joel B. Zweibel, New York City, J. Michael Deasy, Nashua, N.H., for Unsecured Creditors Committee.

Howard J. Berman, New York City, for Equity Committee.

Virginia A. Greiman, U.S. Trustee.

Larry M. Smukler, Sr. Asst. Atty. Gen., Concord, N.H., Mark W. Vaughn, Daniel J. Callaghan, Manchester, N.H., for State of N.H.

David J. Dunfey, Hampton, N.H., for Citicorp and Consolidated Utilities & Communications, Inc. (CUC).

Anthony C. Marts, Manchester, N.H., R. Jay Fortin, New York City, for First Fidelity Bank.

Robert J. Ross, Washington, D.C., for New Hampshire Yankee.

Connie L. Rakowsky, Concord, N.H., for New England Elec. Service.

## MEMORANDUM OPINION ON FIRST INTERIM FEE AND EXPENSE APPLICATIONS

JAMES E. YACOS, Bankruptcy Judge.

This case involves the reorganization of a regulated public electric utility company in which there are pending numerous interim fee and expense reimbursement applications filed and noticed under this court's "Order Establishing Interim Fee And Expense Reimbursement Application Procedure" dated May 11, 1988. [See Annex "A" to this opinion].

The present applications cover the period from the filing of the chapter 11 petition on January 28, 1988 through June 30, 1988. The applications and amounts involved were set forth in a Notice of Hearing and attached Summary which was mailed to creditors and other parties in interest on July 20, 1988 in accordance with the aforesaid interim application procedural order. [See Annex "B" to this opinion].

The legal and factual context and background concerning this complex reorganization proceeding have been set forth in several prior orders and opinions by this

court involving the interim period in question. See, e.g., *In re PSNH*, 84 B.R. 1 (March 17, 1988, decision re complex reorganization procedures); 86 B.R. 7 (April 22, 1988, decision re replacement counsel retention); 88 B.R. 518 (June 7, 1988, decision re advisor retention for merger and acquisition services); 88 B.R. 521 (June 22, 1988, decision re exclusivity extension); 88 B.R. 546 (June 22, 1988, decision re intervention motions).

As indicated in the notice and summary the total billings requesting reimbursement during the January 28, 1988 through June 30, 1988 period is in the amount of $4,269,-750.89. This total figure is comprised of $3,389,559.79 in professional fees requested; and $880,191.10 in reimbursable expenses claimed.[1] While the fees and expenses requested are obviously quite substantial in amount, the incurring of substantial administrative obligations in press-

ing the reorganization effort in this complex proceeding is no surprise.

The court itself has been pressing for maximum effort by all concerned, as indicated in the above-cited orders and opinions, with the objective of a plan or reorganization being filed by the debtor by December 27, 1988—less than one year from the filing of this chapter 11 proceeding. If that objective is accomplished it will cut at least a year—perhaps years—off the otherwise expectable administrative costs of this reorganization. Such result would be much earlier than anyone anticipated at the commencement of these proceedings, and would compare favorably to the time frame normally required in massive chapter 11 cases.[2]

With regard to applications by those attorneys involved in activities most directly-related to the special chapter 11 reorganization aspects of this case, the pending applications indicate the following:

| Entity Represented | Legal Fees Requested | Services/Total Hours |
| --- | --- | --- |
| Debtor In Possession (General Counsel) | $782,760.00 | 3,394.50 |
| Debtor In Possession (Local Counsel) | $253,641.91 | - - - |
| Debtor In Possession (Regulatory Counsel) | $423,990.95 | 2,281.95 |
| Unsecured Creditors Committee (General Counsel) | $783,457.05 | 4,043.00 |
| Unsecured Creditors Committee (Local Counsel) | $ 64,960.00 | 464.00 |
| Equity Holders Committee (General Counsel) | $274,995.00 | 1,478.00 |

The other fee applications are for various special counsel appointed to represent the debtor in possession with regard to its manifold activities before various regulatory agencies, courts and other more or less normal legal operational matters. At the

hearing the court received evidence to the effect that the debtor's general counsel screens such applications as a routine matter and did not find any of these requests excessive or out of the normal pattern of activity by such "outside counsel" in his

1. The summary used for the first interim period with regard to expenses is somewhat confusing in that it does not specifically give a breakdown for the expenses billed for June 1988 but not yet paid at the time the interim applications were filed. The court has directed a simplified and less confusing format in future summarizations in which the notice will indicate all payments *for* the particular interim period, under the standing interim payment procedures, even

though some of the automatic payments have not yet been made at the time of the particular application filing.

2. See, e.g., *In re Johns Manville, Inc.* filed in 1982 and pending (S.D.N.Y.); *In re A.H. Robins, Inc.*, filed in 1985 and pending (E.D.Va.).

experience in reviewing such fee billings prior to bankruptcy.[3]

## PROCEDURAL CONTEXT

Under the May 11, 1988 order the debtor was authorized to pay against monthly billings 75 percent of billings for legal services and 100 percent of billings for reimbursable expenses. Under the order this process was to continue as a routine matter, subject to the initial screening of such billings by the general counsel for the debtor in possession, with all applicants to file their requests for ratification of such interim payments and any requests for additional payments for the interim period in question. Such applications would be filed, noticed, and heard on a quarterly basis.[4]

In accordance with this procedure, the pending applications were noticed for hearing before the court on August 12, 1988. Prior to that time various responsive pleadings were filed, including an extensive statement by the United States Trustee indicating numerous questions as to particular items of the various applications for fees and reimbursable expenses, and a general argument in favor of keeping interim allowances to the 75 percent figure authorized by the standing order in this case.

By agreement of all parties who attended the August 12th hearing, the interim fee hearing was continued until September 9, 1988. On September 8, 1988 the United States Trustee filed a further statement indicating that she had received considerable further information and clarification through various conferences and responses by the applicants following the first hearing and stating that she "now withdraws her objections dated August 4, 1988 without prejudice to the right to appear and be heard on further interim as well as final fee applications."

While withdrawing her specific objections filed before the earlier hearing, the United States Trustee in her September 8, 1988 statement made the following additional comment:

At the same time, however, the United States Trustee states in her opinion that the estate would be better served if interim compensation were limited to 85% of the amounts sought, until such time as this reorganization proceeding is seen to be nearer a conclusion. The law does not compel this Court to grant interim allowances in full. In fact, most of the reported cases reflect interims being awarded at less than the full amount claimed. In this case it would seem that services should bring the case to a point where progress is tangible, and the reasonableness of services can be better determined, before full interim allowances are granted.

Finally, the United States Trustee notes that as further interim fees are sought, this office will face once again the enormous task of reviewing same. Unfortunately, this task does not contribute to reorganization *progress* in proportion to the effort expended and the time consumed by this office as well as that of the applicants.

Much of the hearing on September 9, 1988 involved arguments by all parties as to whether either the 75 percent or 85 percent factor was appropriate. The fee applicants generally argue that there should be no "withholding" and that they should have interim allowance of their fee billings in full. The argument made was generally to the effect that such "withholding" or "hold-back" of fees to counsel involved in a reorganization proceeding was supported only by a rationale of withholding fees to encourage more expeditious activity by counsel involved in the case. The applicants argued that such rationale was

---

**3.** The application of Ropes & Gray, the debtor's original counsel authorized at the outset of this case by an interim order to act as attorneys for the debtor in possession pending ruling upon certain conflict questions, does include an amount for chapter 11 reorganization activity. Out of a total request for fees in the amount of $454,761.24, Ropes & Gray includes an item of

$189,260.00 for legal services to the debtor in possession during that initial interim period.

**4.** Due to the process of initial start-up of this procedure the first interim applications, as indicated above, cover a period somewhat in excess of the calendar quarter.

inapplicable in the present proceeding and that in any event such a "carrot and a stick" approach was demeaning to the professionals involved and perhaps even to the court itself.

## APPLICABLE LAW

Prior to the enactment of the 1978 Bankruptcy Code bankruptcy courts had by case decisions developed a practice of allowing interim allowances on fees even though there was no statutory authorization for the practice. See, 2 *Collier on Bankruptcy* 15th Ed. ¶ 331.01. (1988).

Section 331 of the 1978 Bankruptcy Code for the first time explicitly authorized the bankruptcy court to allow interim compensation:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

Section 331 does not provide any specific standards for interim compensation allowances but does make reference to compensation for services and reimbursement for expenses "as is provided under § 330 of this title." Section 330 in turn provides for allowance of "reasonable compensation for actual necessary services" and "reimbursement for actual necessary expenses" with certain additional detail regarding compensation for services, i.e. "....based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title...."

It was recognized by all present at the hearings on these interim fee applications that the great majority of bankruptcy courts who have dealt with interim compensation allowances since the enactment of the 1978 Bankruptcy Code have adopted some "hold-back" procedure for such allowances—usually at a 75 percent level, i.e., withholding 25 percent of the amount of the attorneys' billing statements. One or two courts have allowed 100 percent interim allowances against billing statements in reported decisions. The applicants also point to several other, unreported decisions by bankruptcy courts allowing 100 percent interim allowances.

Those courts which have seen fit to apply § 331 of the Bankruptcy Code with a "hold-back" of some amount, as a routine matter on interim fee allowances, express their rationale in various ways. In the case of *In re Four Star Terminals*, 42 B.R. 419, 11 CBC 2d 47 (Bankr.D.Alaska 1984), Bankruptcy Judge Williams states:

> Section 331 does not require, however, that the Court shall grant the full amount of the interim fee, even if it is reasonable under § 330. The court in *In re Coconut Grove Bayshore, Inc.*, 33 B.R. 194, 195 (Bkrtcy.S.D.Fla.1983) points out that the general practice of the courts under the Act and which is unchanged by the Code is to allow "only such interim compensation as would almost certainly be allowed the applicant under all possible contingencies at the close of the case." Under the rationale of *Coconut Grove*, after the court makes a determination as to the reasonableness of the fees requested, a second determination must be made as to how much should be paid as an interim allowance.

As noted above, it is often difficult to determine the value of an attorney's services, especially in a Chapter 11 proceeding, at least until a determination has been made as to whether a plan can be confirmed. As one commentator explains:

> "Usually the outcome of a reorganization case is not predictable at the time of its commencement. A reorganization plan may not be confirmed, or consummation may not be achieved with resultant dismissal or conversion to a liquidation case. Further, in a

liquidation case or, perhaps, even in a successful reorganization case, the amount of monies or other assets available for the payment of administrative expenses, including compensation, may be limited."

*2 Collier on Bankruptcy ¶ 331.01, 331–2 (15th Ed.1984).*

"It is only at the conclusion of the case that a determination of the full value of the services performed by the particular professional or fiduciary can be made, since only then is a thorough analysis by the court of the various relevant factors set forth in section 330 possible."

\* \* \* \* \* \*

The court is under a duty to review the reasonableness of the total fees paid pursuant to § 330 at the time of consideration of the final application. There is the possibility in every case that a through analysis in regard to the final application using the factors set forth in § 330 and discussed earlier will show that the interim fees awarded were too high based on the end result, even though the fees appeared reasonable at the time they were awarded. In most cases, a hold-back of 25% of the interim fee as found to be reasonable will cover any changes occurring at the time of the review of the final fee application. It should be noted, however, that the amount held back will not be placed in escrow, and whether the amounts held back and allowed as part of the final fee award are actually paid will depend on the assets available for payment at that time.

The 25% figure is not an absolute, and may only be a starting point for analysis in some cases. There may be exceptional circumstances where it will be necessary to hold back less than 25% in order for the case to continue. It will be up to the attorney who makes such a request to clearly demonstrate that exceptional circumstances exist.

There will also be cases in which a hold-back of more than 25% will be appropriate. In *In re Codesco, Inc.,* 15 B.R. 354, 8 B.C.D. 482, 5 C.B.C.2d 738 (Bkrtcy.S.D.N.Y.1981), interim fees were requested by counsel for the creditors' committee. The reorganization was not going forward, and an application had been filed to convert the case to Chapter 7. The court refused to allow any interim fees to be paid, noting that any administrative expenses of the Chapter 7, if the case were converted, would have priority, and there were no unencumbered assets available for the payment of fees. A similar result was reached in *In re First Hartford Corporation,* 23 B.R. 729, 9 B.C.D. 1045, 7 C.B.C.2d 662 (Bkrtcy.S.D.N.Y.1982) in which a super priority claim had been granted to a creditor pursuant to § 364(c) before the application for interim fees was made. The court refused to allow payment of any interim fees as there were no assets which were unencumbered. [42 B.R. at 438–439, 11 CBC 2d at pp. 66–68]

One bankruptcy court has held that a prior special standard applicable to interim fee allowances established by case decisions under the prior Bankruptcy Act survived the enactment of § 331 of the Bankruptcy Code. As stated by Bankruptcy Judge Britton in *In re General Coffee Corp.,* 39 B.R. 7 (Bankr.S.D.Florida, March 8, 1984):

It is settled in this Circuit that interim awards should be "well below any possible final allowance." *In re Multiponics, Inc.,* 551 F.2d 1049, 1050 (5th Cir.1977); *In re TMT Trailer Ferry, Inc.,* 457 F.2d 100, 102 (5th Cir.) *cert. denied* 409 U.S. 849, 93 S.Ct. 57, 34 L.Ed.2d 91 (1972). These cases were decided under the former Act, but it is clear from the legislative history that the only intended effect of § 331 was to remove any doubt that interim compensation may be authorized. House Report No. 95–595, 95th Cong., 1st Sess. 330 (1977); Senate Report No. 95–989, 95th Cong. 2nd Sess. 41–2 (1978) U.S.Code Cong. & Admin. News 1978, p. 5787. [39 B.R. at p. 8]

A similar approach embodying the rationale developed by the case law under the prior Act appears in *In re UNR Industries, Inc.,* 30 B.R. 613, 10 BCD 1020 (Bankr.N.D.

Ill.1983), in the words of Bankruptcy Judge Toles:

However, as the Debtors note in their answer, the purpose of the interim compensation provision is only to relieve attorneys from the economic burden of participating in lengthy and complex bankruptcy proceedings. *In re Mansfield Tire & Rubber Co.*, 19 B.R. 125 [N.D.Ohio 1981]. Interim allowances are not to be made in premium amounts based upon a final evaluation of the services rendered; instead, the goal is sustenance with the thought that final awards should reflect the Court's view of the overall value of the services. *In re Mansfield* at 127; *In re Pennsylvania Tire & Rubber Co. of Mississippi*, 19 B.R. 124 [N.D.Ohio 1980]; *In re Georgia Steel, Inc.*, 19 B.R. 834 [M.D.Ga.1982]; *In re Penn Dixie Industries*, 18 B.R. 834, 836 [8 BCD 1134] n. 2 [S.D.N.Y. 1982]. [30 B.R. at 616–618, 10 BCD at 1023]

One court denying full interim allowances, based on billing statements, explicitly rejected the contention that § 331 by its reference to § 330 mandated full amount allowances if the § 330 criteria are met. Bankruptcy Judge Williams in *In re Pennsylvania Tire & Rubber Company Of Mississippi, Inc.*, 19 B.R. 124 (Bankr.N.D.Ohio 1980), disagreed with that approach and elected to adopt the alternative "payment on account" approach suggested by the *Collier on Bankruptcy* treatise:

The difference of opinion arises over applicants' assertion that they are entitled to the full amount sought, their construction of § 331 being that so long as the criteria of § 330 are met, full payment for actual necessary services rendered should be made upon application properly filed.

The court disagrees with this approach and instead, adopts that discussed in 2 *Collier on Bankruptcy*, 15th Ed., para. 331.03, pg. 331–7:

Alternatively, interim compensation may be a payment on account of an ultimate final allowance. The Code appears to leave this alternative available to an applicant who may desire consid-eration of the ultimate results achieved, e.g., the attorney for the debtor or the trustee. It is only at the conclusion of the case that a determination of the full value of the services performed by the particular professional or fiduciary can be made, since only then is a through analysis by the court of the various relevant factors set forth in section 330 possible. Nor, for that matter, would it be proper to allow interim compensation merely by taking a percentage of some hypothetical final award. Interim allowances are always subject to the court's re-examination and adjustment during the course of the case, and all expenses of administration must receive the court's final scrutiny and approval.

The court is not willing to relinquish its right to review the case at its conclusion and take into account, in awarding compensation, not simply the time spent, but the nature and quality of services rendered as well, which determinations can only be made, it would seem, with knowledge of the results obtained. Indeed, *Collier, supra,* para 330.05[2] seems to support such a conclusion and quotes with approval the following statement from Herzog, *Fees and Allowances in Bankruptcy*, 36 Conn.B.J. 374, 381 (1962):

The *sine qua non* of the allowance is the benefit the bankrupt's estate and its creditors have derived from the services. [19 B.R. at p. 125]

There are several courts who have adopted the "full payment against billings" approach to interim allowances, as indicated above, but there are few *reported* decisions so holding. The unreported actions by various courts in allowing full payment are of no particular aid to this court in that they contain no explanation of the rationale for the action taken by the particular court in the circumstances of its particular case.

One reported decision questioning the practice of a routine "hold-back" on interim allowances appears in *In re Wilson Foods Corp.*, 36 B.R. 317 (Bankr.W.D.Okla.1984),

in which Bankruptcy Judge Bohanon states a flexible position giving considerable emphasis to the solvency and financial condition of the debtor before him:

> The SEC has suggested that it is the better practice with regard to awarding payment for interim compensation that the Court, in all cases, allow compensation at less than the full amounts requested. Thus, it advocates the position that bankruptcy courts should properly "hold back" a certain percentage of requested compensation. This proposition is supported by several cases which have followed this practice. *See e.g. Matter of Georgia Steel, Inc.*, 19 B.R. 834 (Bkrtcy. M.D.Ga.1982); *Matter of Mansfield Tire and Rubber Company*, 19 B.R. 125 (Bkrtcy.N.D.Ohio 1981); *Matter of Pennsylvania Tire and Rubber Co. of Mississippi Inc.*, 19 B.R. 124 (Bkrtcy.N.D.Ohio 1980); accord *In re Coconut Grove Bayshore, Inc.*, 33 B.R. 194 (Bkrtcy.S.D.Fla. 1983). However, as the SEC acknowledges, that rule is not absolute. Cf. *In re Bobbie Brooks, Inc.*, No. B 82–0144 (Bankr.N.D.Ohio 1982); *In re Goldblatt Bros. Inc.*, No. 81 B 7075 (Bankr.N.D.Ill. 1981); *In re Western Farmer*, 8 B.R. 539 (Bkrtcy.W.D.Wash.1981).

> There is no Bankruptcy Code authority nor legislative history which would mandate applying in every case the "hold back" principle. Indeed, as noted in the above cases, courts have previously allowed full compensation on an interim basis when circumstances warrant. Also, it is clear that when it enacted the new Code, Congress particularly sought to overrule decisions and cast aside the concept that bankruptcy courts were restricted to the view of "economy of administration" in fee matters. On this point Congress has stated *"Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir.1968) is overruled. Notions of economy of the estate in fixing fees are outdated and have no place in bankruptcy code." 124 CONG.REC. 32,395 (1978).

* * * * * *

In this case we fail to see a need for imposing partial payment of compensation by applying a hold back. The debtor both presently and at time of filing was a solvent company and by all indications its apparent chance of an effective reorganization is much greater than most. It is an on-going concern which has successfully settled major labor disputes which it says caused it to initially seek protection of the Court. We have previously noted the financial assets of the estate as being quite substantial and the court appointed examiner offers favorable projections for the debtor in the months ahead. This case is unlike those cited by the SEC. *In re Mansfield Tire & Rubber Co., supra* (the debtor was substantially in a posture of liquidation); *Matter of Georgia Steel, Inc., supra* (financial condition of the debtor was tenuous); *In re Penn–Dixie Industries, Inc.*, 18 B.R. 834 (Bkrtcy.S.D.N.Y.1982) (potential for survival was considered slim). Rather, the case appears at the opposite end of the financial spectrum and, therefore, commands different considerations. In cases where the rationale for imposing a hold back is absent the Court need not blindly follow this undefined practice. *Matter of Saxon Industries, Inc.*, 29 B.R. 319 (Bkrtcy.S.D.N.Y.1983). [36 B.R. at p. 322]

A quite forceful expression of the rationale for full payment of interim allowances based on billing statements appears in Bankruptcy Judge Matheson's opinion in the case of *In re Kaiser Steel Corp.*, 74 B.R. 885 (Bankr.D.Colo.1987), as follows:

> At the hearing that was held to consider the proposals, the Court addressed on the record the question of whether interim fee allowances to professionals under Section 331 of the Code should be limited to 75% of the fees sought. The Court is aware of cases holding that interim fee applications should be allowed at some reduced percentage of what has been sought. See, e.g., *In re General Coffee Corporation*, 39 B.R. 7 (Bankr.S.D.Fla. 1984). However, the Court disagrees with such holdings.

The legislative history underlying the Bankruptcy Code makes it clear that professionals authorized to be employed pursuant to 11 U.S.C. § 327 to provide services are to be compensated at a rate consistent with that applicable to normal commercial transactions. The concept of penury for professionals espoused in the case of *Massachusetts Mutual Life Insurance Co. v. Brock,* 405 F.2d 429 (5th Cir.1968), was expressly overruled by the legislature, and the concept of notions of economy of the estate in fixing fees was declared to have no place in proceedings under the Code. *See,* 124 Cong.Rec. H11047–117 (daily ed. Sept. 28, 1978) (statement of Sen. Edwards). Complex bankruptcy cases such as these consolidated proceedings cannot function without the serious and dedicated efforts of qualified professionals. The result of such efforts is significant fee requests to be paid out of the estate. Requiring professionals, who must look to the estate for payment of their fees, to finance the administration of the estate by carrying 25% or more of their fees for the term of the bankruptcy case is manifestly unreasonable. Timely payment of billings is an inherent aspect of providing services. Certainly creditors' counsel would rebel at a partial payment arrangement with their clients, and limitations of this nature should not be imposed on those seeking compensation of the estate.

There is a further reason for not imposing an automatic hold-back on fee allowances. This is commonly done as a hedge pending final hearings on fee requests at the close of the estate. The concept is that it protects the estate from having paid excess fee awards and allows the Court to examine the total compensation to be paid professionals at the close of the estate. In part it is used as a vehicle to allow the Court to avoid, on an interim basis, close inspection of fees charged and the reasonableness thereof. However, in cases such as this, if the question of the reasonableness of fees being charged by the professionals is not addressed on a current basis, the Court will soon be facing accumulated fee claims of such a magnitude that it is virtually impossible to assess, on any realistic basis, the reasonableness of the fees. It is far better to consider fully, on a periodic basis, the fees being requested while the evidence of what has been involved, what hearings held and what results achieved are all relatively fresh in the minds of all parties and the Court. For these reasons, the Court will not restrict in advance fee allowances to a fixed percentage of the requested amounts. *In re Wilson Foods Corporation,* 36 B.R. 317 (Bankr.W.D.Okla.1984). [74 B.R. at pp. 887, 888]

It should be noted notwithstanding the forceful general statement in the *Kaiser Steel* opinion quoted above the actual order by the court used a 75 percent allowance with provision for semi-annual requests for "Special Interim Compensation" to recover the other 25 percent. See 74 B.R. at 892–94.

The court in the case of *In re Western Farmers Association,* 8 B.R. 539, 3 CBC 2d 814 (Bankr.W.D.Wash.1981), did allow full interim fees against billing statements—rejecting a contention by the SEC that the granting of full interim fees leads to procrastination. The court reasoned that to adopt the SEC's position would tend to drive qualified counsel away from bankruptcy court proceedings. See, 8 B.R. at 541, 3 CBC 2d at 816. However the bankruptcy court in *Western Farmers* subsequently found it necessary to suspend the payment of the interim compensation allowed by the 1981 order. See comment in *In re Coconut Grove Bayshore, Inc.,* 33 B.R. 194, 195 (Bankr.S.D.Fla.1983).

A similar scenario has unfolded in the chapter 11 reorganization proceedings involving the *UNR* related asbestos producing entities in the Northern District of Illinois. In a 1983 decision the bankruptcy court authorized payment of 100 percent of the first interim request by the creditor committee counsel "in the nature of a retainer" and 75 percent on the second interim application. See *In re UNR Industries, Inc.,* 30 B.R. 613, 10 BCD 1020 (Bankr.N.D.

Ill.1983). Subsequently, on March 6, 1986, the bankruptcy court imposed a moratorium on further interim fee allowances "directed at those bankruptcy counsel and other professionals who were deemed responsible for the progress (or lack of progress) made toward the confirmation of a plan of reorganization in the case." This moratorium was still in effect on April 21, 1987 when the case came before the court on the question of further extension of the debtor's exclusivity. See *In re UNR Industries, Inc.*, 72 B.R. 789, 790, 16 CBC 2d 1269, 1270 (Bankr.N.D.Ill.1987).[5]

The undersigned judge has not had occasion to carefully consider § 331 of the present Bankruptcy Code in terms of the appropriate practice in a complex reorganization under chapter 11 such as the present case. With regard to the general "reasonable fee" standard applicable in bankruptcy cases, as interpreted by the Court of Appeals for this Circuit, this court in an earlier order in the present case commented:

Regularly hourly rates of appointed counsel simply form the "starting point" from which a fee determination is made. The ultimate standard always is whether the final fee award is in fact an award of a "reasonable fee" in the circumstances of the particular case, i.e., reasonable hourly rates applied to reasonable hours expended in rendering necessary services as further adjusted upward or downward by various recognized factors. *In Re Elmendorf Board Corp.*, 57 B.R. [580] at 584–585. [ (Bankr.N.H.1986 ) ]

The regular hourly rates simply do not become *ipso facto* final fee awards in this court. Retention of attorneys at high hourly rates is based not only upon the assumption that attorneys billing at such rates have the necessary experience and competence to handle complex mat-

ters, but also upon the further assumption that attorneys billing at such high rates can normally perform their duties in fewer hours than less experienced attorneys who may bill at a lower rate. If that does not prove true with regard to the providing of particular services in this case, the court will not feel compelled at the time of final fee awards to allow the full hourly rate for any such services. [86 B.R. 7, 11–12]

The First Circuit decisions are discussed in detail in the cited prior *Elmendorf* opinion. Cf. also *In re Manoa Finance Company, Inc.*, 853 F.2d 687, 18 BCD 295 (9th Cir. 1988).

### THE PRESENT CASE

There is no question that the debtor involved in this reorganization has the financial capability to pay interim fee allowances of the magnitude herein requested without impairing its operational or other financial requirements. While the amounts involved may seem overly-large for slightly over a five month period, these amounts are not out of line with administrative expenses in other massive complex chapter 11 reorganizations. The record indicates among other comparisons that the annual administrative expenses in the reorganization of the LTV related entities pending in the Southern District of New York is running at approximately 31 million dollars per year. The comparison of the time period to the amount involved also has to take into consideration the typically heavy time involvement of all professionals at the beginning stages of a complex reorganization in just "getting up to speed" as to the pertinent factual and legal context in which the reorganization effort will be played out.

I have no question that the professionals involved in these applications during the

---

**5.** The case of *In re Knudsen Corporation,* 84 B.R. 668 (Ninth Cir.BAP 1988), has been cited in support of the proposition for full payment against attorneys' billing statements on interim fee applications. However, the only issue for decision in that case was "Whether the bankruptcy court has authority to approve a fee payment and application procedure that permits periodic post-petition payments to professionals without prior court approval of the payment."

See 84 B.R. at p. 670. The interim procedure order there involved did require quarterly review and approval by the bankruptcy court. The case is further weakened as a precedent by the fact noted by the majority to the effect that the bankruptcy case there involved was "essentially a controlled liquidation for the benefit of a secured creditor" and the fact that the secured creditor had agreed to the fee payment procedure. 84 B.R. at pp. 671 and 673.

interim period in question have in fact been engaged in a "full court press" as expressed by counsel for the equity committee. My conclusion in that regard is based not only upon the applications and supporting documentation but upon my observation throughout that period of the activities of counsel at various hearings on numerous matters.

The amount of these applications also has to be considered in light of the issues and responsibilities devolving upon the professionals involved in this reorganization, i.e., the potential massive swing of asset values up or down partly dependent upon the quality and results of the professional services provided. As indicated during the course of several hearings on June 9, 1988, that massive swing in asset values could approach one-and-a-half billion dollars in this estate. See *In re PSNH*, 88 B.R. 558 (July 20, 1988), decision re adequate protection interest payments; *In re PSNH*, 88 B.R. 563 (July 20, 1988), decision re cash collateral motion.

The court also can note that the fee and the expense applications in this proceeding have received the detailed personal attention of the United States Trustee and are "pre-screened" by general corporate counsel of the debtor. The U.S. Trustee apparently has been able to get full and complete cooperation from all professionals as to requested documentation and backup information.

Based upon these factors and my review of all the applications and of the court files

and proceedings involved during the subject interim period, I do not have much question that these applications could be ordered to be paid in full *provided that* it is not necessary for this court to make a final determination as to all "reasonable fee" factors under § 330 of the Bankruptcy Code in the full sense pertaining to final fee awards under the applicable case decisions. If I can properly elect the "payment on account" alternative approach suggested in 2 *Collier on Bankruptcy* 15th Ed, ¶ 331.03 [6], then full allowance of the application requests is warranted since all applicants have continued to provide services and the present interim *allowances* clearly will be below the final fee *awards* for the total services provided to this estate.

### THE "HOLD–BACK" ARGUMENT

The astute reader will note that I have used quotation marks around the "hold-back" references in this opinion because it seems to me upon reflection and consideration of this matter that that phrase is somewhat misleading in terms of analysis of an appropriate approach and practice to interim allowances under § 331 of the Bankruptcy Code.

The concept of a "hold-back" stems I believe from the reading of § 331's cross reference to the provisions of § 330 which include reference to a "reasonable fee". The argument is then made that in allowing interim allowances the court necessarily must determine whether the billed time of the attorneys for the interim period in question involves a reasonable fee and that

---

**6.** The *Collier* treatise comments on pp. 331–7 to 331–8 as follows:

"Thus, a court may allow interim compensation under section 331 in an amount equal to the actual services rendered by the applicant prior to the date of the fee request, i.e., full compensation. This would include compensating *attorneys* and other *professional* persons at the full value of the professional services rendered so long as the interim compensation allowed otherwise comports with the requirements of section 330. In such a situation, the applicant generally would not be entitled to any further compensation for such services, except to the extent there was a specific reservation of rights in the application."

"Alternatively interim compensation may be a payment on account of an ultimate final allowance. The Code appears to leave this alternative available to an applicant who may desire consideration of the ultimate results achieved, e.g., the attorney for the debtor or the trustee. It is only at the conclusion of the case that a determination of the full value of the services performed by the particular professional or fiduciary can be made, since only then is a thorough analysis by the court of the various relevant factors set forth in section 330 possible. Nonetheless, the fact that the final results of the case cannot be determined should not preclude interim compensation for the reasonable value of the actual and necessary services rendered to date *to the extent such are ascertainable.*" (Emphasis supplied)

therefore, unless the court determines to the contrary, any withholding of the amounts billed necessarily is a "hold-back" of otherwised authorized fees. The problem for the court however is that this phrase in effect begs the question. Essentially Congress has given the courts an impossible task if that strict reading of § 331 and § 330 is adopted.

It has been well established in numerous court decisions, including those of the First Circuit cited in my *Elmendorf* opinion cited above, that a "reasonable fee" under § 330 of the Bankruptcy Act can never be determined until all pertinent factors, including the results obtained from the services, are determined at the close of the case or the termination of the providing of the legal services in question. Indeed, the applications of those attorneys involved in the *chapter 11–specific* reorganization services summarized above all reserve their right to apply for an enhancement of fees over regular hourly billing charges at the conclusion of the case if appropriate under established law. That "lodestar adjustment" can also go *downward* of course. The point is that interim allowances under § 331 are just that, i.e., *allowances* and not fee *awards,* unless the court elects the first alternative suggested in the *Collier* comment quoted above, i.e., full and final compensation for the actual services rendered during the specific interim period.

For the reasons indicated in the preceding paragraph, I do not believe that the "first alternative" suggested by *Collier* is really available in that the "results obtained" normally will not be determinable within the interim period involved. There may be in particular instances discrete matters of legal service that could be so evaluated; but as a general matter in an ongoing reorganization the efforts of the reorganization professionals cannot be evaluated in that fashion.

Several of the applicants have suggested that the "comparable services" factor included in § 330 of the Code mandates 100 percent allowance of billed legal services since a "hold-back" of any amount of their billings would not comport with the treat-ment they receive from their non-bankruptcy clients. The short answer to this argument is that they *are* involved with a bankruptcy client and that the comparable services factor included in § 330 is only one factor in determining a reasonable fee and applies only to the *rate* of compensation involved. See *In re UNR Industries, Inc.,* 30 B.R. 613, 616–619, 10 BCD 1020, 1023–24 (Bankr.N.D.Ill.1983). There is no indication in the legislative history of §§ 330 and 331 of the Code that would support a reading of the "comparable services" factor as intended to change the *manner and timing* of attorney fee payments in bankruptcy proceedings to comport with practices with non-bankruptcy clients. On the contrary, the legislative references are in terms of *rates* and the need to get away from the prior court decisions limiting bankruptcy counsel to a lower rate of compensation compared to their colleagues. See *Senate Report,* No. 95–989 95th Cong., 2d Sess. 40 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

As for the final argument that any "hold-back" procedure in chapter 11 cases will drive experienced bankruptcy counsel away from the bankruptcy court, I can only comment that there are cases and there are cases. I doubt very much whether a "hold-back" procedure in a case of this magnitude, with interim allowances averaging in the neighborhood of one hundred and fifty dollars an hour on overall basis even at a "hold-back" level, will deflect any counsel from appearing in this or any similar case in the future. There is also the possibility that "delay in payment" may be a compensating enhancement factor in final fee awards in this Circuit upon an appropriate showing. See *In re Boston & Maine Corporation,* 776 F.2d 2, 7 (1st Cir.1985).

### THE "PAYMENT ON ACCOUNT" APPROACH

 After considering the record in the present matter, and the well-briefed positions of the various parties and the United States Trustee on the question of the appropriate legal standard under § 331 of the Bankruptcy Code, I conclude that the "pay-

ment on account" approach alternative is appropriate in this case and in chapter 11 proceedings generally. To make this possible, and to harmonize the somewhat conflicting provisions of §§ 330 and 331 of the Bankruptcy Code, I further conclude that an interim fee allowance can be made under § 331 of the Code upon a determination of "general reasonableness" or a "surface determination of a reasonable fee" rather than a strict determination of all reasonable fee factors necessary to be made in conjunction with a final fee award.

I further conclude that adoption of this approach under § 331 necessarily requires the court to make interim allowances on the basis that the amounts involved are below what may be anticipated as the final fee awards in the case. I do not believe that I am restricted to the "well-below" standard apparently applicable in the Fifth and Eleventh Circuits as noted in *Coconut Grove,* supra, and *Matter of Georgia Steel, Inc.,* 19 B.R. 834 (Bankr.M.D.Ga.1982). I do believe however that the approach I have elected requires that each round of interim fee allowances result in orders allowing such amounts, on the particular application and cumulatively, which total something below the level of anticipated final fee awards.

In reaching this conclusion I do not adopt the rationale suggested by some courts, and by the applicants in the present matter, that the allowance of less than billed amount on interim fees is bottomed only upon a concept that full payment of interim requests will simply result in procrastination and nonperformance of professional duties on a timely basis. I do not believe that any such danger presently exists in this case and I do not believe that the professionals appointed by this court in this proceeding would delay any necessary services simply because of interim fee procedures and orders of this court. In any event, that rationale also assumes that the court is somehow "withholding" fee amounts already determined as appropriate—an assumption I reject. In other words, the rationale is not the "carrot and the stick" but the simple fact that this court cannot realistically make final deter-

mination of "reasonable fees" at each interim stage on a strict basis for the reasons already stated.

## THE PRESENT APPLICATIONS

■ Since the court will not adopt any fixed "percentage rule" or standard for interim allowances in this case, it will be necessary to deal with each round of interim applications in their own context and in the status of the case at the particular stage involved.

With regard to the pending first round of interim applications the court has little difficulty in authorizing full payment by the debtor in possession of the requested interim fee allowances before the court. A separate order will be entered authorizing and directing the debtor in possession to make such payments forthwith, including reimbursement of the necessary and proper expenses also requested. The U.S. Trustee as indicated has withdrawn any specific objections to amounts included within these applications, and under the approach I am taking full payment of these requests will not result in a binding determination at the time of final fee orders in this case. The amounts requested under the present applications are clearly below the amount of final fee awards in a case of this magnitude.

## CONCLUSION

While the court has no difficulty in acting on this first round of interim applications, it is necessary to deal to some extent with the question of any "bright-line rules" or "per se" rules with regard to future interim fee requests and expense reimbursement requests.

■ With regard to interim fee requests, the U.S. Trustee in her original statement suggested a great number of per se rules that I believe are impractical in interim allowance procedures. However, in her further statement of September 8, 1988 she included in paragraph nine thereof the following general guidelines on interim fee applications which I do find to be appropriate for further procedures in this case:

(a) Intra-office conferences must be kept to a minimum. If conferences appear to be necessary and of justifiable frequency and duration, ordinarily all professionals in attendance may charge for their conference time. Charges for any conferences which are not shown to be justifiable or reasonable are subject to inquiry and objection.

(b) Professionals rendering services which appear to be below their level of expertise and thus properly delegable to a junior professional or staff person, are subject to inquiry and objection.

(c) Engaging in litigation which on its face does not appear to be reasonable, duplicating the work of other professionals without justification, performing unproductive, excessive or otherwise unnecessary work will bring inquiry and objection.

(d) Any professional charging the estate for recurring attendance at hearings or meetings, wherein the professional does not appear to participate or contribute to the case in any way, is subject to inquiry and objection.

(e) Any firm charging the estate for recurring attendance of two (or more) of its professionals at hearings or meetings, wherein such breadth of coverage does not appear to be reasonable, is subject to inquiry and objection.

(f) Professionals should make every effort to describe the services rendered with specificity, and should avoid "lumping" where practicable. If "lumping" of significant issues prevents a determination of whether the time expended was reasonable, the professional or firm will be subject to inquiry and objection.

(g) Professionals may bill their regular hourly rates for travel time, however the United States Trustee may object where it is not apparent that the travel time was necessary or productive, or the travel time extends beyond normal working hours.

(h) Professionals seeking reimbursement of expenses should provide adequate explanation of any expense item or dollar amount claimed which on its face would likely raise a question with parties not familiar with the billing practices of that professional or firm.

(i) Reimbursement for photocopying should be at actual cost, not to exceed 20 cents per copy, unless the applicant can demonstrate why a higher rate should be allowed.

(j) Reimbursement of travel expenses should not include first class air fare or accommodations in a locale's most expensive hotels or restaurants, when reasonable alternatives are ordinarily available.

The court has "editorialized" to some extent in that I have changed paragraph 9(i) above to limit photocopying to 20 cents per copy rather than the 25 cents per copy suggested by the U.S. Trustee. I have also added a reference to restaurants in paragraph 9(j) to the U.S. Trustee's Statement.

These guidelines leave room for discretion by both the applicants, the U.S. Trustee, and the court in implementing the same in conjunction with future interim fee hearings. However, all professionals involved are strongly encouraged to operate within the spirit and intent of these guidelines during the further progress of this case.

With regard to reimbursement of expenses, it is not as appropriate to defer until the conclusion of the case final determinations of reimbursable expenses in most instances. For that reason the court will consider the entry of a "bright-line rule" order at the next interim fee hearings to define those items which will not be allowable for reimbursement in future applications. For initial guidance in that regard, I would refer all parties to the suggestions by the United States Trustee in her August 5, 1988 statement, at pages 17, 19–21, as to expense items that seem to me to be particularly susceptible to fixed rules regarding reimbursement. This comment is not intended to limit the U.S. Trustee or any other parties as to those items, or any

other items, that might be suggested for inclusion in a future order on reimbursement of expenses.

Finally, the allowance of full payment on the present interim fee applications does not require the court at this time to resolve the issue raised by "non-reorganization" attorneys who argued that since they are not seeking any premium or enhancement in their fees at the conclusion of the case, and are simply law firms who generally have been providing routine operational legal services to the debtor, both before and after the chapter 11 filing, there should be no "hold-back" or "payment on account" approach taken to their interim fee requests. The court will defer on that matter and consider any further arguments that the parties wish to make at the next interim fee hearing.

ANNEX A

EXCERPTS FROM "ORDER ESTABLISH-
ING INTERIM FEE AND EXPENSE
REIMBURSEMENT APPLICATION
PROCEDURE"

DATED MAY 11, 1988

\* \* \* \* \* \*

1. Pursuant to 11 U.S.C. § 330, all allowances of interim compensation and reimbursement of expenses are subject to this Court's final review at or before the conclusion of this case.

2. All allowances of interim compensation and reimbursement of expenses shall be without prejudice to any party in interest to seek reconsideration of the matter for cause.

3. Failure to file a specific objection to any application shall not be deemed a waiver of the right of any party in interest to later file objections on any grounds to any subsequent interim or final allowance.

4. A Professional may submit an invoice to the debtor at the specially designated address of 1000 Elm St., P.O. Box 3880, Manchester, NH 03105 itemizing the compensation for services rendered and reimbursement of costs and expenses incurred during any prior month with a copy to counsel for the Unsecured Creditors' Committee and Counsel for the Equity Holders Committee. For compensation, the invoice shall indicate the date the service was rendered, the individual who performed the service, the time spent, and a brief description of the service. For costs and expenses incurred, the invoice shall indicate the type of cost or expense incurred and the amount. A computer printout reflecting the foregoing information shall suffice.

5. Unless the court orders otherwise, by the end of each calendar month, the debtor shall pay 75% of the compensation for services rendered and 100% of the costs and expenses as reflected in each invoice received on or before the sixteenth day of that month.

\* \* \* \* \* \*

8. Each Professional who has received payment of interim compensation or reimbursement of expenses relating to a calendar quarter shall prepare an application for approval of the invoices rendered relating to such quarter. Applications for interim compensation and reimbursement of expenses for services rendered from January 28, 1988 through June 30, 1988 must be filed by July 15, 1988, and shall be served upon the Short List. The service copy of the fee application to the United States Trustee shall also include a copy of the invoices submitted to the debtor for the applicable quarter. Copies of invoices shall be made available to others only upon request.

\* \* \* \* \* \*

12. Unless the parties on the Short List are notified otherwise, this Court will schedule said application(s) for a hearing during the months of August, November. February and May on the Court's regularly scheduled motion day. The debtor shall notice the hearing in accordance with Bankruptcy Rule 2002(a)(7). The Court may direct the debtor to pay or withhold any part of the requested payment notwithstanding the fact an objection was not filed.

\* \* \* \* \* \*

ANNEX B

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF

## NEW HAMPSHIRE

In re Public Service Company of New Hampshire, Debtor

Chapter 11 Case

No. 88-00043

NOTICE OF HEARING ON APPLICATIONS FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR SERVICES RENDERED FROM JANUARY 28, 1988 THROUGH JUNE 30, 1988

PLEASE TAKE NOTICE that Public Service Company of New Hampshire ("Public Service") has filed the attached SUMMARY—APPLICATIONS FOR REIMBURSEMENT—PROFESSIONALS—PERIOD ENDED JUNE 30, 1988, pursuant to the "Order Establishing Interim Fee and Expense Reimbursement Application Procedure" dated May 11, 1988. APPLICATIONS for INTERIM FEES will be heard on Friday, August 12, 1988, at 9:30 a.m., or as soon thereafter as counsel may be heard, in the Courtroom of the Honorable James E. Yacos, United States Bankruptcy Judge, 275 Chestnut Street, 7th Floor, Manchester, New Hampshire 03101, in accordance with the Court's "Order Establishing Interim Fee and Expense Reimbursement Application Procedure" dated May 11, 1988.

Under this Court's "Order Establishing Interim Fee and Expense Reimbursement Application Procedure" dated May 11, 1988, any response to such Applications must be filed with the Court and served on Public Service and upon the Short List (a current copy of which can be obtained from the Clerk of the Bankruptcy Court) not later than August 5, 1988. Any response filed must state which itemized entries should be disallowed or reduced and the reasons therefor.

Dated: July 20, 1988

(s) Don Willenburg
Don Willenburg, a Member of
STUTMAN, TREISTER & GLATT
Professional Corporation
225 Franklin Street, Suite 3100
Boston, Massachusetts 02110
Telephone: (617) 423-9594

Attorneys for Public Service
Company of New Hampshire

Of Counsel:

SULLOWAY, HOLLIS & SODEN

9 Capitol Street

Concord, New Hampshire 03301

Telephone: (603) 224-2341

SUMMARY—APPLICATIONS FOR REIMBURSEMENT—PROFESSIONALS
PERIOD ENDED JUNE 30, 1988

| FIRM | Period Covered | Bill Total | Services | Pay 75% Services | INTERIM PAYMENT SERVICES | Pay 100% Expenses | PAYMENT EXPENSES | PAYMENTS TO DATE | AMOUNT TO BE WITHHELD |
|---|---|---|---|---|---|---|---|---|---|
| DEBTOR IN POSSESSION | | | | | | | | | |
| Cahill Gordon & Reindel | 1/28-6/30 | 489,130.57 | 423,990.95 | 317,993.21 | 254,125.50 | 65,139.62 | 59,212.98 | 313,338.48 | 105,997.74 |
| Rope Gray | 1/29-6/30 | | | | | | | | |
| PS | | 223,102.72 | 189,260.00 | 141,945.00 | | 33,842.72 | 0.00 | | 47,315.00 |
| N.H. Yankee | | 314,569.87 | 265,501.24 | 199,125.93 | | 49,068.63 | | | 66,375.31 |
| | | 537,672.59 | 454,761.24 | 341,070.93 | | 82,911.35 | 0.00 | | 113,690.31 |
| Stutman, Treister & Glatt | 2/19-6/30 | 863,861.16 | 782,760.00 | 587,070.04 | 368,916.43 | 81,101.16 | 55,434.81 | 424,351.24 | 195,689.91 |
| Sulloway Hollis & Soden | 1/28-6/30 | | | | | | | | |
| PSNH | | 243,489.51 | 231,334.63 | 173,500.97 | 173,500.97 | 12,154.88 | 12,154.88 | 185,655.85 | 57,833.66 |
| Seabrook–Related | | 23,077.77 | 22,307.28 | 16,730.46 | 11,957.06 | 770.49 | 346.60 | 12,303.66 | 0.00 |
| | | 266,567.28 | 253,641.91 | 190,231.43 | 185,458.03 | 12,925.37 | 12,501.48 | 197,959.51 | 57,833.66 |
| Bruder & Gentile | 2/1-6/30 | 1,389.09 | 1,174.03 | 880.52 | 234.59 | 215.06 | 171.52 | 406.11 | 293.51 |
| Doub, Muntzing & Glasgow | 1/28-6/30 | 67,753.78 | 23,711.46 | 17,783.60 | | 388.16 | | | |
| Gallagher, Callahan & Gartrell | 1/29-6/30 | | | | | | | | |
| PSNH | | 13,705.88 | 13,218.25 | 9,913.68 | | 487.63 | | | 3,304.57 |
| Seabrook–Related | | 5,115.26 | 1,803.42 | 1,352.56 | | 16.00 | | | 450.86 |
| | | 18,821.14 | 15,021.67 | 11,266.24 | 0.00 | 503.63 | 0.00 | 0.00 | 3,755.43 |
| Peat Marwick Main & Co. | 1/28-6/30 | 117,902.00 | 108,527.00 | 81,395.25 | 88,190.00 | 9,375.00 | 7,963.00 | 96,153.00 | 0.00 |

| FIRM | Period Covered | Bill Total | Services | Pay 75% Services | INTERIM PAYMENT SERVICES | Pay 100% Expenses | PAYMENT EXPENSES | PAYMENTS TO DATE | AMOUNT TO BE WITHHELD |
|---|---|---|---|---|---|---|---|---|---|
| Sheehan, Phinney, Bass and Green (PSNH Share Only) | 1/29–5/31 | 108,745.68 | 35,632.38 | 26,724.28 | | 3,047.83 | | | |
| Sklar, Debbie–Ann R. | | 749.25 | 746.25 | 559.69 | 559.69 | 3.00 | 3.00 | 562.69 | 186.56 |
| Tourtellotte, Ross and Gray (PSNH Share Only) | 1/29–6/30 | 431,119.36 | 142,498.55 | 106,873.91 | | 10,876.90 | | | 35,624.64 |
| Troutman, Sanders, Lockerman & Ashmore (PSNH Share Only) | 1/29–6/30 | 73,260 33 | 23,682.30 | 17,761.73 | | 2,375.98 | | | 5,920.57 |
| TOTAL | | 2,976,972.23 | 2,266,147.74 | 1,699,610.83 | 897,484.24 | 268,863.07 | 135,286.79 | 1,032,771.03 | 518,992.32 |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS** | | | | | | | | | |
| Committee Members | 2/10–6/30 | | | | | 16,717.11 | | | |
| Deasy & Dwyer | 2/17–6/30 | 68,944.15 | 64,960.00 | 48,720.00 | 41,643.00 | 3,984.15 | 3,452.24 | 45,095.24 | 16,240.00 |
| Kramer, Levin, Nessen, Kamin & Frankel | 2/16–6/30 | 912,346.09 | 783,457.05 | 587,592.79 | 465,985.50 | 128,889.04 | 88,766.34 | 554,751.84 | 195,864.26 |
| Total | | 981,290.24 | 848,417.05 | 636,312.79 | 507,628.50 | 149,590 30 | 92,218.58 | 599,847.08 | 212,104.26 |
| **OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS** | | | | | | | | | |
| Committee Members | 5/15–6/30 | | | | | 4,136.48 | | | |
| Whitman & Ransom | 4/15–6/30 | 311,488.42 | 274,995.00 | 206,246.25 | 119,270.77 | 38,004 09 | 14,062.45 | 133,333.22 | 68,748.75 |
| Total | | 311,488.42 | 274,995.00 | 206,246.25 | 119,270.77 | 42,140.57 | 14,062.45 | 133,333.22 | 68,748.75 |
| Total This Page | | 1,292,778 66 | 1,123,412.05 | 842,559.04 | 626,899.27 | 191,730.87 | 106,281.03 | 733,180.30 | 280,853.01 |
| Total Page 1 | | 2,976,972 23 | 2,266,147.74 | 1,699,610.83 | 897,484.24 | 268,863.07 | 135,286.79 | 1,032,771.03 | 518,992.32 |
| TOTALS | | 4,269,750.89 | 3,389,559.79 | 2,542,169.87 | 1,524,383.51 | 460,593 94 | 241,567.82 | 1,765,951.33 | 799,845.33 |